T.C. Memo. 1999-276


UNITED STATES TAX COURT


CHARLES T. WICKERSHAM AND SANDRA J. WICKERSHAM, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14562-97.                    Filed August 20, 1999.


<u>George W. Connelly, Jr.</u>, and <u>Linda S. Paine</u>, for

petitioners.

<u>Wanda M. Cohen</u> and <u>R. Scott Shieldes</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a deficiency of

$97,899 and a penalty pursuant to section 6663(a) of $73,424 with

respect to petitioners' 1989 Federal income tax.[1]

---

[1]  Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

After concessions,[2] the primary issue for decision is whether Charles T. Wickersham (Mr. Wickersham) is liable for the fraud penalty pursuant to section 6663(a).  If we so find, we must decide whether there is a deficiency for 1989.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.  At the time they filed their petition, petitioners, husband and wife, resided in Orange, Texas.

Mr. Wickersham's Businesses

In September 1988, Elco International, Inc. (Elco), was incorporated.  Elco purchased and operated a grain elevator in Houston, Texas.  Mr. Wickersham and Lester Winfree (Mr. Winfree) were two of the four owners and directors of Elco.

During 1989, Mr. Wickersham owned and operated a Ford-Lincoln-Mercury dealership, an insurance company, and a leasing company.  He also was involved in commercial property development and owned 50 percent of a landholding company.

The Peveto

The Peveto Grain Elevator (the Peveto) is located in Orange, Texas.  In 1985, G & B Products purchased the Peveto and converted it from a grain elevator into a grinding facility that

---

[2] Respondent concedes that Sandra J. Wickersham is not liable for the deficiency or the fraud penalty pursuant to sec. 6663 for 1989.

G & B Products used to grind and bag rice hulls.  On August 8, 1988, the Small Business Administration (SBA) foreclosed on the Peveto.

Before February 1989, Mr. Wickersham became interested in property being auctioned by the Resolution Trust Corporation (RTC).  He requested to be placed on RTC mailing lists, and as a result he received a brochure regarding the auction of the Peveto on February 23, 1989 (the auction).  Mr. Wickersham attended the auction, and he was the high bidder for the Peveto.

The terms of the auction did not permit Mr. Wickersham to purchase the Peveto for the bid price; instead, the rules allowed Mr. Wickersham to negotiate with the SBA for an opportunity to purchase the Peveto.  Sometime after the auction, Mr. Wickersham reached an agreement with the SBA to purchase the Peveto for $100,000.  On March 27, 1989, by special warranty deed, the SBA conveyed the Peveto to Mr. Wickersham.

The OCPND

The Orange County Port and Navigation District (OCPND) is a governmental entity created by the Texas legislature to administer the port in Orange County, Texas.  The OCPND board is composed of five commissioners.

From May 1988 throughout 1989, the five commissioners on the OCPND board were Mr. Winfree, Wallace Wayne Frederick (Mr. Frederick), Walter Mullins, James Smith, and John Young (Mr. Young).  During this time, the OCPND board held regular and

"special called" meetings at which the OCPND conducted all official business.

On April 10, 1989, the OCPND board held a regular meeting at which the commissioners discussed the acquisition of a grain bagging facility. The OCPND board appointed Mr. Frederick and Mr. Young to approach Mr. Wickersham about acquiring the Peveto. Mr. Winfree recused himself from participating in the OCPND's attempt to acquire the Peveto because of his and Mr. Wickersham's joint business interest in Elco.

Sometime after April 10, 1989, Mr. Frederick and Mr. Young met with Mr. Wickersham and discussed the OCPND's interest in acquiring the Peveto. After the first meeting with Mr. Wickersham, Mr. Young did not participate in the negotiations.

Mr. Wickersham and Mr. Frederick had several discussions, in person and via telephone, regarding the sale of the Peveto. Mr. Frederick offered Mr. Wickersham $350,000 for the Peveto, but Mr. Wickersham was firm that he wanted $450,000. Mr. Frederick told Mr. Wickersham that a decision regarding the Peveto would be made at a special meeting of the OCPND board on July 31, 1989.

On July 31, 1989, the OCPND board held a special meeting at which the commissioners again discussed purchasing the Peveto. Mr. Frederick recommended that the OCPND buy the Peveto for $450,000. The board voted to purchase the Peveto from Mr. Wickersham for $450,000.

Mr. Wickersham's Accountant

Since 1984, Jane Whitfield (Ms. Whitfield), a certified public accountant, has been Mr. Wickersham's return preparer for his personal and corporate tax returns. She also gave Mr. Wickersham general tax advice when he was considering business deals. In July 1989, when Mr. Wickersham thought the OCPND board was going to vote to acquire the Peveto, Mr. Wickersham went to Ms. Whitfield to discuss how he could save money on the sale of the Peveto.

Mr. Wickersham told Ms. Whitfield about the OCPND's interest in the Peveto and that he was interested in acquiring a piece of real property owned by a longtime business associate (Ms. Stark). Ms. Whitfield and Mr. Wickersham discussed the possibility of a like-kind exchange pursuant to section 1031.

Mr. Wickersham approached Ms. Stark about selling him some land she owned in a three-way transaction, and she agreed to the sale. Sometime between August 11 and 18, 1989, however, Ms. Stark's attorney informed Mr. Wickersham that he (the attorney) had advised Ms. Stark not to go through with the three-way transaction.

Mr. Wickersham's Tax Attorney

After learning that Ms. Stark would not participate in the three-way transaction, Mr. Wickersham spoke with his tax attorney, Peter Wells (Mr. Wells), and informed him of the

situation.  Previously, Mr. Wickersham had told Mr. Wells that the OCPND was pressuring him to sell the Peveto and that the OCPND had indicated that it wanted to condemn the Peveto.  Mr. Wells researched the matter and informed Mr. Wickersham that he needed a letter from the OCPND memorializing a threat of condemnation.  Mr. Wells advised Mr. Wickersham not to close on the Peveto until the OCPND gave him a letter memorializing the threat of condemnation.

The Events Surrounding August 22, 1989

On or around August 22, 1989, Mr. Wickersham went to the office of the OCPND board's attorney (Mr. Dies) with a draft letter prepared by Mr. Wells threatening condemnation of the Peveto (the draft letter).  At this time, Mr. Wickersham informed Mr. Dies that Mr. Wells would call Mr. Dies regarding the draft letter.

On August 22, 1989, Mr. Wells called Mr. Dies and told Mr. Dies that Mr. Wickersham was entitled to a letter threatening condemnation.  Furthermore, Mr. Wells and Mr. Wickersham wanted Mr. Dies, on behalf of the OCPND, to sign the draft letter.  Mr. Dies told Mr. Wells that he did not think the draft letter was appropriate because he did not remember the OCPND's discussing condemnation of the Peveto.  Mr. Wells' position was that his client had been threatened with condemnation by Mr. Frederick during the discussions Mr. Frederick had with Mr. Wickersham.

Mr. Dies contacted Mr. Frederick to ask him whether he (Mr. Frederick) had threatened Mr. Wickersham with condemnation. Mr. Frederick replied that he had threatened Mr. Wickersham. Mr. Dies then called Mr. Wells and told him that he (Mr. Dies) would draft a letter to reflect what Mr. Frederick had told him (Mr. Dies). Mr. Dies signed the letter he drafted (Mr. Dies' letter of condemnation), and it was given to Mr. Wickersham at the closing on the Peveto.

Petitioners' 1989 Tax Return

Petitioners timely filed a joint individual Federal income tax return for 1989 (1989 return). Ms. Whitfield prepared the 1989 return.

Before Ms. Whitfield's preparation of the 1989 return, Mr. Wickersham told Ms. Whitfield that he had sold the Peveto under threat of condemnation. After learning of this, Ms. Whitfield researched the deferral of gain under section 1033. After researching the issue, she called Mr. Wickersham and told him that she needed confirmation of the threat of condemnation. Mr. Wickersham gave Ms. Whitfield Mr. Dies' letter of condemnation.

Ms. Whitfield relied on Mr. Dies' letter of condemnation to prepare the 1989 return. On the 1989 return, petitioners fully disclosed the transaction between the OCPND and Mr. Wickersham involving the Peveto. Ms. Whitfield did not include the gain from the sale of the Peveto in petitioners' income on the 1989 return. Instead, she prepared a statement entitled "Supplemental

Information, Election under Code Sec. 1033(a)(2) Not to Recognize Gain from Compulsory or Involuntary Conversions."  In this statement, Ms. Whitfield reduced the basis in the replacement properties purchased by Mr. Wickersham by the amount of gain recognized on the sale of the Peveto.[3]  Ms. Whitfield and petitioners signed the 1989 return.

The Criminal Proceedings

On July 29, 1992, a grand jury returned an eight-count superseding indictment (the indictment) in the case of United

---

[3]  The supplemental information statement reads as follows:

Charles T. Wickersham * * * elected in accordance with Code Sec 1033(a)(2) and Reg 1.1033(a)-2 not to recognize a realized gain in the amount of $350,000 from the involuntary conversion of a commercial rental property.  The realization of gain on, and the involuntary conversion of, the business property occurred during the taxable year ended December 31, 1989.

The property was acquired by the taxpayer on March 2, 1989, at a cost of $100,000.  The property was sold on August 22, 1989 for $450,000.  The realized gain was $350,000.

Taxpayer elected under Code Sec 1033(a)(2), and Reg. 1.1033(a)-2 not to recognize the gain on conversion since replacement property was acquired, which taxpayer claims to be similar or related in service or use to the converted property.  The adjusted basis of the replacement property is as follows:

| | |
|---|---|
| Cost of Northway Property | $352,000 |
| Cost of 16th Street Property | 98,000 |
| Total | $450,000 |
| Less:  Realized gain not recognized per this election | (350,000) |
| Basis of replacement property | $100,000 |

States v. Wickersham, Criminal No. 1:92-CR-98, in the U.S. District Court for the Eastern District of Texas. Count VI of the indictment charged Mr. Wickersham with willfully making and subscribing a U.S. individual income tax return, verified under penalties of perjury and filed with the Internal Revenue Service, which he did not believe to be true and correct in every material matter in that the income tax return failed to report a taxable capital gain of $349,641 realized from the sale of the Peveto to the OCPND, as he then and there well knew and believed that the Peveto had not been involuntarily converted and that taxes were due from any gain so realized from the sale in violation of section 7206(1).

After a 6-day trial, the jury found Mr. Wickersham guilty on count VI of the indictment and acquitted Mr. Wickersham and the other defendants (Mr. Winfree and Mr. Frederick) on all other counts. In United States v. Wickersham, 29 F.3d 191 (5th Cir. 1994), the U.S. Court of Appeals for the Fifth Circuit affirmed the conviction.

OPINION

I. Fraud

The penalty in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud.

See Helvering v. Mitchell, 303 U.S. 391, 401 (1938).  Fraud is intentional wrongdoing on the part of the taxpayer with the specific purpose to evade a tax believed to be owing.  See McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

The Commissioner has the burden of proving fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b).  To satisfy the burden of proof, the Commissioner must show:  (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).  The Commissioner must meet this burden through affirmative evidence because fraud is never imputed or presumed.  See Beaver v. Commissioner, 55 T.C. 85, 92 (1970).

A.    Fraudulent Intent

The Commissioner must prove that a portion of the underpayment for each taxable year in issue was due to fraud.  See Professional Servs. v. Commissioner, 79 T.C. 888, 930 (1982).  The existence of fraud is a question of fact to be resolved from the entire record.  See Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence,

and reasonable inferences may be drawn from the relevant facts. See <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943); <u>Stephenson v. Commissioner</u>, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).  Mere suspicion, however, does not prove fraud. See <u>Cirillo v. Commissioner</u>, 314 F.2d 478, 482 (3d Cir. 1963), affg. in part and revg. in part T.C. Memo. 1961-192; <u>Katz v. Commissioner</u>, 90 T.C. 1130, 1144 (1988); <u>Shaw v. Commissioner</u>, 27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (6th Cir. 1958).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These badges of fraud include:  (1) Understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash.  See <u>Spies v. United States</u>, <u>supra</u> at 499; <u>Douge v. Commissioner</u>, 899 F.2d 164, 168 (2d Cir. 1990); <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; <u>Recklitis v. Commissioner</u>, 91 T.C. 874, 910 (1988).  Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence.  See <u>Solomon v.</u>

<u>Commissioner</u>, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.

Respondent contends that the following establish fraud: (1) Mr. Wickersham's sophistication and experience, (2) the context of the events and a pattern of conduct by Mr. Wickersham, (3) Mr. Wickersham's lack of credibility, and (4) Mr. Wickersham's section 7206(1) conviction.

B.    <u>Mr. Wickersham's "Sophistication"</u>

The sophistication, education, and intelligence of the taxpayer are relevant to determining fraudulent intent. See <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 211 (1992); <u>Stephenson v. Commissioner</u>, <u>supra</u> at 1006; <u>Iley v. Commissioner</u>, 19 T.C. 631, 635 (1952). Contrary to respondent's assertion, however, the sophistication, education, and intelligence of a taxpayer are not themselves badges of fraud. These considerations are relevant to the determination of whether a taxpayer could have formed the intent necessary to be found liable for the fraud penalty. See <u>Niedringhaus v. Commissioner</u>, <u>supra</u> at 211; <u>Stephenson v. Commissioner</u>, <u>supra</u> at 1006; <u>Iley v. Commissioner</u>, <u>supra</u> at 635.

Mr. Wickersham owns and operates a car dealership and engages in some real estate ventures/transactions. There is no evidence suggesting that he had any training in accounting, tax planning, or tax return preparation. On the basis of these

facts, we shall not hold Mr. Wickersham to either a high or low standard while evaluating his actions.

C.    Context of Events/Pattern of Conduct

Respondent argues that Mr. Wickersham has a history of using his knowledge and sophistication to take advantage of others for personal gain.  Respondent points to two transactions:  (1) Mr. Wickersham's securing a letter of credit for Mr. Winfree and (2) Mr. Wickersham's purchasing property from Ms. Stark at a reduced price.

1.    The Letter of Credit

To secure the loan used to fund Elco, each of the four owners was required to put up a letter of credit.  Mr. Winfree's bank agreed to issue him a letter of credit, and it was going to charge him approximately $1,500 for this service.  Mr. Wickersham offered to get Mr. Winfree a letter of credit for the same price, and Mr. Winfree accepted.  Mr. Winfree's testimony suggests that Mr. Winfree allowed Mr. Wickersham, rather than the bank, to make a profit on the letter of credit as a favor to Mr. Wickersham and that Mr. Wickersham did not take advantage of Mr. Winfree.[4]

---

[4]  Mr. Winfree testified as follows:

   And I came back and told Mr. Wickersham that I was ready to go; I had my letter of credit okayed.  And he said, Well how much are they going to charge you?  And I told him.  And he said, Well, why don't you let me make that money?

(continued...)

2.    The Transaction With Ms. Stark

After Ms. Stark backed out of the three-way transaction, she offered to sell the property Mr. Wickersham was interested in to him at a reduced price.  Mr. Wickersham later purchased Ms. Stark's property at a reduced price.

3.    Conclusion

Respondent's position on brief is that "While each of these instances does not present technically inappropriate behavior, petitioner's pattern of conduct resonates strongly in the context of tax fraud."  We agree with respondent that neither of these transactions constituted inappropriate behavior; however, we disagree with respondent's ultimate conclusion regarding these transactions.  While a taxpayer's entire course of conduct can be indicative of fraud, see Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969), we conclude that these two transactions are not a pattern of fraudulent conduct by Mr. Wickersham, and they are not indicative of fraud.

D.    Mr. Wickersham's Credibility

Respondent argues that portions of Mr. Wickersham's testimony are implausible and not credible.  At trial, we had the

---

⁴(...continued)
    And I said, Well, how are you going to do it?  He said, Well, I have some money on deposit there; I'll just pledge it, and I won't even have to disturb the -- drawing the interest on it; I'll just make this extra $1,500.  So that was all right with me.  I wrote him a check for $1,500, and that's the way that came about.

opportunity to observe Mr. Wickersham, and we found his testimony generally to be credible. Furthermore, many of the witnesses corroborated much of Mr. Wickersham's testimony. Mr. Wickersham's testimony does not indicate the presence of a fraudulent intent.

E.    The Section 7206(1) Conviction

Respondent contends that Mr. Wickersham's conviction under section 7206(1) is evidence that Mr. Wickersham intended to evade taxes.

While a conviction under section 7206(1) is a factor to be considered, it is not dispositive, and this Court has consistently interpreted the "due to fraud" language contained in section 6663 to require proof of specific intent to evade a tax believed to be owing. See Wright v. Commissioner, 84 T.C. 636, 639, 644 (1985). A conviction under section 7206(1) does not establish as a matter of law that the taxpayer violated a legal duty with the intent to evade taxes because the intent to evade taxes is not an element of the crime charged under section 7206(1). See id. at 641, 643.

F.    Conclusion

Apart from Mr. Wickersham's conviction under section 7206(1), the other badges of fraud are noticeably absent from the case at bar. Furthermore, petitioners fully disclosed the transaction involving the Peveto on the 1989 return. The only evidence respondent adduced to establish fraud is Mr. Wickersham's conviction under section 7206(1).

While the section 7206(1) conviction may raise our suspicions, mere suspicion does not prove fraud, and we cannot find that respondent sustained his heavy burden to prove fraud by clear and convincing evidence.  See Rinehart v. Commissioner, T.C. Memo. 1983-184.  After reviewing all of the facts and circumstances, we conclude that respondent has failed to prove clearly and convincingly that for 1989 Mr. Wickersham intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Accordingly, we do not sustain the fraud penalty for 1989.

II.  Period of Limitations/Deficiency for 1989

Respondent issued the statutory notice of deficiency in the case at bar more than 6 years after petitioners filed the 1989 return.  The 1989 return is not a false or fraudulent tax return with the intent to evade tax.  See supra pp. 10-17.  Therefore, section 6501(c)(1) is inapplicable to the case at bar, and the assessment of any deficiency for 1989 is barred by the expiration of the period of limitations provided by section 6501.  Accordingly, the issue of whether there is a deficiency for 1989 is moot.

To reflect the foregoing,

Decision will be entered for petitioners.