T.C. Memo. 2021-114

UNITED STATES TAX COURT

ROBERT S. CLARK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 23074-16, 13576-17.            Filed September 28, 2021.

Steven P. Flowers and Sloane R. Lile, for petitioner.

William F. Castor, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, Judge:  In 2011 through 2014, the years at issue, Robert S. Clark owned an auto body shop, rental properties, a large home, and numerous trucks, automobiles, and utility vehicles.  His ability to acquire these assets is a remarkable feat given that, according to his tax returns, he had taxable income of $114, $0, $0,

[*2] and $0,[1] respectively, during those years.  Or he fraudulently underreported his income.  The Commissioner established by clear and convincing evidence that he fraudulently underreported his income.

## FINDINGS OF FACT

Mr. Clark owns an auto body shop in Pryor, Oklahoma, called Clark's Body Shop.  Before opening his body shop, Mr. Clark attended college and studied pre-med with the goal of becoming a dentist.  But Mr. Clark, who suffers from dyslexia, struggled to pass his algebra and chemistry courses and dropped out after three years of school, never receiving his degree.  In 2002, Mr. Clark married Tracy Schmidt, and during their marriage, they had two children together.  Although they remained married during the years at issue, Ms. Clark is not a party to these cases.  Mr. Clark also has two children and one stepchild from a previous marriage.  During the years at issue, Mr. Clark owned the body shop, residential property, rental property, numerous vehicles, and multiple bank accounts.

I.     Clark's Body Shop

During the years at issue, Mr. Clark owned and operated Clark's Body Shop as its sole proprietor.  Mr. Clark started the body shop in 1990, and in 2000, he

---

[1]All monetary amounts are rounded to the nearest dollar.

[*3] purchased commercial real estate in Pryor to operate his business. The property consisted of 0.77 acres of commercial property and a shop building; in 2004, Mr. Clark added a metal shop building, an office, and a canopy. The Mayes County assessor valued the body shop at $228,843 for 2011 through 2013 and at $230,493 for 2014.[2]

In 2009, Mr. Clark bought nearly half an acre of unimproved commercial property abutting the body shop's property for $50,000. The Mayes County assessor valued this unimproved property at $50,068 for 2011 through 2013 and $70,095 for 2014.

During the years at issue, Mr. Clark did not have an accountant or financial professional manage the body shop's finances.

II.    Residential Property

In 2001, Mr. Clark bought nine acres of land on which he built a 320-square-foot metal shop building, a 1,680-square-foot shop building, and a 1,760-square-foot shed. In 2005, Mr. Clark added a 3,584-square-foot house on the property, in which he continued to live during the years at issue. He added two more shop buildings (1,610 square feet and 1,360 square feet) in 2009. Mayes County

---

[2]Pryor, Oklahoma, is in Mayes County.

[*4] assessed the entire property for tax purposes, valuing it at $459,656 for 2011 through 2013 and $437,883 for 2014.

III.    Rental Properties

Mr. Clark owned three other properties in Pryor that he used as rental properties.[3]

A.    428th Street Property

Mr. Clark bought a residence on five acres of land in 2008 for $74,000. The Mayes County assessor valued it at $77,850 for 2010 through 2013 and $80,100 for 2014. Mr. Clark received periodic payments from the occupants of this property during the years at issue.

B.    Wood Street Property

Mr. Clark bought two city lots and an 816-square-foot residence in 1993 for $32,500. Mayes County assessed the property at $21,905 for 2011 and 2012 and $35,500 for 2013 and 2014. Mr. Clark received monthly rental income from this property during the years at issue.

---

[3]The Commissioner initially included the rental income from these properties as unreported gross receipts on Mr. Clark's Schedule C, Profit or Loss From Business. However, he conceded at trial that the deposited rental checks are more properly characterized as rental income.

**[*5]** C.     Graham Avenue Property

In 2012, Mr. Clark bought commercial real estate consisting of a 2,738-square-foot building on a quarter-acre of land.  He paid $46,500 for the property.  Mayes County assessed the property at $58,718 for 2012 and $46,368 for 2013 and 2014.  Mr. Clark allowed a family member to operate her business out of the property rent free.

IV.     Mortgages and Payments on Business, Rental, and Residential Properties

Mr. Clark had several mortgages on his real properties.  He made timely payments on these mortgages.

A.     Clark's Body Shop Mortgage and Payments

Mr. Clark mortgaged his body shop property in 2009 to secure a $230,781 loan.  The promissory note to Bank of Locust Grove had a 10-year maturity date ending in 2019.  Mr. Clark committed to making monthly payments of $2,568 on the note, which he paid from early September 2009 through July 2013.  These payments totaled approximately $30,000 a year.

Mr. Clark refinanced this loan in September 2013 with a note for $199,345, agreeing to make monthly payments of $2,213.  He made these payments on time from October 2013 through 2014, which annualized to approximately $26,000.

[*6]   B.   <u>Residential Property Line of Credit, Payments, and Disclosures</u>

Mr. Clark had a $30,000 line of credit from Yorktown Bank that he used for Clark's Body Shop and that he renewed annually.[4] He obtained the line of credit in 2010 and secured it with his residential property. He made frequent but sporadic payments on this line of credit, paying principal and interest each month in amounts ranging from $45 to nearly $7,000.

To renew this line of credit, Mr. Clark prepared a financial statement and submitted it to Yorktown Bank. For 2014, he claimed to have $1.29 million in assets, $367,000 in liabilities, and a net worth of $923,000. Among his assets he listed $20,000 of cash on hand in banks; a primary residence worth $350,000; additional real estate of $375,000, $210,000, and $45,000; and four vehicles ranging from $25,000 to $80,000. Among his liabilities, Mr. Clark listed $172,000 in real estate loans attributed to his rental properties and a $195,000 mortgage on his body shop. Mr. Clark submitted an additional financial statement to Yorktown Bank in 2015 claiming to have the same amounts of assets and liabilities.

---

[4]Yorktown Bank acquired Century Bank in 2012. We will refer to the institution as Yorktown Bank.

[*7]   C.   Rental Property Mortgages and Payments

      1.   Wood Street Mortgage

In 2010, Mr. Clark borrowed $57,647 from Lakeside Bank of Salina, secured by a mortgage against the Wood Street property.  The variable-rate promissory note initially required monthly payments of $433.  During the years at issue, Mr. Clark made monthly payments on the loan in fluctuating amounts of as much as $650 but most typically $450.  Mr. Clark speculated that he paid the mortgage using the rent checks he received for the property plus whatever cash he had available, ensuring to pay at least the required monthly amount.  These payments totaled at least $5,500 each year.

      2.   428th Street Mortgage

In 2008, Mr. Clark borrowed $86,205 from Lakeside Bank of Salina, secured by a mortgage against the 428th Street property.  The variable-rate promissory note initially required Mr. Clark to pay $647 per month.  As with the Wood Street loan, Mr. Clark made payments in varying amounts of as much as $850, and he paid at least $7,700 on this loan each year.

      3.   Graham Avenue Mortgage

In March 2012, Mr. Clark borrowed $48,946 from the Bank of Locust Grove, secured by a mortgage against the Graham Avenue property.  The variable-

[*8] rate promissory note initially required monthly payments of $413. Mr. Clark made the monthly payments from April 2012 through at least 2014. The total of these payments varied from just over $7,000 to nearly $10,000 annually.

## V. Vehicles and Auto Loans

During the years at issue, Mr. Clark owned several vehicles. Some vehicles he lent to customers when their cars were in the shop. Others he held for personal use. And as a car enthusiast and mechanic, Mr. Clark also bought some of the cars to fix them for resale.

To purchase 15 of these vehicles, Mr. Clark took out loans from Bank of Locust Grove and Lakeside Bank of Salina. He borrowed against one vehicle.

### A. Polaris Ranger CRU

In 2008, Mr. Clark signed a promissory note to borrow $10,125. He used the proceeds to buy a Polaris Ranger CRU, a utility vehicle. Mr. Clark made monthly payments of $254 on the Ranger until he paid off the loan in early 2012. The Ranger was a personal vehicle, which Mr. Clark owned at the end of 2013.

### B. 1934 Ford Coupe

In 2010, Mr. Clark borrowed $32,665 to buy a 1934 Ford Coupe. He paid off the loan in early 2011 when he sold the Coupe. The Coupe was a personal vehicle.

**[*9]**  C.    Hummer H2 Limo

In 2011, Mr. Clark borrowed $30,465 to buy a Hummer H2 Limo, which he used to operate a limo service.  The promissory note required Mr. Clark to pay the entire loan plus interest by December 2011.  Mr. Clark made various payments on the loan before paying it off in full in December 2013, two years past the maturity date.  The record is silent as to whether Mr. Clark owned the Hummer H2 Limo at the end of 2013.

D.    Chevy SK1

Mr. Clark borrowed $9,561 in 2011 to buy a Chevy SK1 pickup.  He sold the SK1 and paid off the loan in full by its maturity date in June 2012.

E.    International 470 Truck

In 2011, Mr. Clark borrowed $6,646 to buy an International 470 truck.  He agreed to repay the loan in one lump sum, plus interest, in May 2012.  Mr. Clark repaid the loan in full in January 2012.  He still owned the International 470 in 2013.

F.    Ford F2S

Mr. Clark borrowed $20,786 in 2011 to buy a Ford F2S wrecker.  The note matured in September 2012, and Mr. Clark repaid it in full in September 2013, a year past its maturity date.  He owned the wrecker at the end of 2013.

[*10] G.    Kubota Tractor

In 2011, Mr. Clark borrowed $23,975 to buy a Kubota tractor and loader. He repaid the loan in September 2013 and owned the Kubota through 2013.

H.    Polaris RZR

In 2012, Mr. Clark borrowed $10,817 to buy a Polaris RZR, a utility vehicle. Mr. Clark agreed to pay $261 a month from October 2012 until the loan's maturity date in September 2016. Mr. Clark made payments in varying amounts, in excess of the required monthly payment, through June 2014. The payments on the Polaris RZR amounted to approximately $3,000 a year. The Polaris RZR was a personal vehicle, which Mr. Clark owned at the end of 2013.

I.    2000 Chevy

Mr. Clark borrowed $3,820 in 2012, listing a 2000 Chevy as collateral. He did not recall whether he used the borrowed funds to buy the 2000 Chevy or borrowed against a Chevy he already owned. He repaid the loan in full in March 2013. Mr. Clark did not remember whether he owned the 2000 Chevy at the end of 2013.

J.    Ford Supercrew

In 2012, Mr. Clark borrowed $17,175 to buy a Ford Supercrew pickup. The promissory note bore a maturity date in March 2013, with the balance to be paid in

[*11] a single lump-sum payment.  Mr. Clark repaid the note in full by August 2012 and used the Supercrew as his personal vehicle.  He still owned the Supercrew at the end of 2013.

K.      1995 Ford F150

In 2013, Mr. Clark signed a note to borrow $4,859 to buy a 1995 Ford F150.  He made payments of $225 a month from March 2013 to December 2013.

L.      1999 Lincoln

Mr. Clark borrowed $5,391 in 2013 to buy a 1999 Lincoln.  He repaid the loan in full in June 2013, eight months before the maturity date.  He owned the Lincoln at the end of 2013.

M.      1972 Chevy 1/2 Ton

In 2013, Mr. Clark borrowed $8,364 to buy a 1972 Chevy 1/2 Ton.  Mr. Clark made payments from April 2013 to November 2013, when he repaid the loan in full, five months before the maturity date.  Mr. Clark owned the Chevy 1/2 Ton through the end of 2013.

N.      1947 Rat Rod

On June 29, 2013, Mr. Clark borrowed $11,110 to buy a 1947 Rat Rod.  On July 1, 2013, Mr. Clark repaid the loan in full.  Mr. Clark believes he sold the Rat Rod later that year.  The Rat Rod was a personal vehicle.

[*12] O.    Grasshopper Mower

On June 29, 2013, Mr. Clark borrowed $10,411 to buy a Grasshopper mower.  Mr. Clark repaid the loan on July 1, 2013.  Mr. Clark owned the mower at the end of 2013.

VI.    Divorce

Mr. and Ms. Clark separated on November 1, 2013, and Ms. Clark filed for divorce in April 2014.  The Clarks' divorce became final in 2017.

The Clarks' divorce decree included a division of assets.  In the divorce, Ms. Clark received $56,000 in previously joint assets; most of these assets were vehicles.  Mr. Clark received $340,705 of assets, including several vehicles, the contents of the body shop, and the couple's residential property and its contents. He also received the rental properties.  The decree also included a child support computation form.  On the form, Mr. Clark's gross income is reported at $6,000 per month.  Oddly, none of that $6,000 is attributed to self-employment income.

VII.    Checking and Loan Accounts

Mr. Clark maintained several checking accounts and loan accounts, some of which were joint with Ms. Clark before the separation and divorce.

[*13]  A.    <u>Yorktown Bank Checking and Payroll Accounts</u>

Before the Clarks separated, Mr. Clark maintained two commercial checking accounts at Yorktown Bank. One was a checking account styled Mr. and Ms. Clark doing business as (d.b.a.) Clark's Body Shop. The other was a checking account styled Mr. and Ms. Clark d.b.a. Clark's Body Shop, Payroll Account. Checks paid to Clark's Body Shop were deposited directly into both accounts.

Mr. Clark closed these accounts in 2013 after he and Ms. Clark separated. In December 2013, Mr. Clark opened two new accounts at Yorktown Bank. As before, one was a checking account styled Mr. Clark d.b.a. Clark's Body Shop and the other was a checking account styled Mr. Clark d.b.a. Clark's Body Shop, Payroll Account. Again, checks payable to the body shop were deposited into both accounts. We will refer to the two payroll accounts singularly as the Yorktown Payroll Account and the two nonpayroll accounts singularly as the Yorktown Checking Account.

Mr. Clark also had two additional business checking accounts at Yorktown Bank labeled Free Business Checking on his bank statements. Mr. Clark transferred cash from his payroll accounts into these checking accounts. We will refer to these two accounts as the Free Business Checking accounts.

**[*14]** B.     Bank of Locust Grove Checking Account

Mr. Clark maintained a commercial checking account at Bank of Locust Grove.  The Locust Grove account was a checking account styled Mr. Clark d.b.a. Clark's Body Shop & Wrecker.  Mr. Clark deposited checks he received in connection with his body shop into this account.  He also wrote checks from the account to pay for the mortgage on the 428th Street rental property.  We will refer to this account as the Locust Grove Checking Account.

C.     Bank of Locust Grove Loan Accounts

Mr. Clark used the Bank of Locust Grove for his various loans and mortgages, including mortgages on his body shop and the Graham Avenue property, and his vehicle loans.  It was Mr. Clark's practice to deposit checks from body shop customers directly into these loan accounts.  Mr. Clark deposited business proceeds into the loan accounts to pay down the principal and the interest on the loans.

D.     Overdraft Fees

Mr. Clark had a remarkable propensity to accrue overdraft fees at his banks. For example, in 2011 he paid $30,300 of fees for overdrawing the Yorktown Payroll Account.  That year Mr. Clark paid an additional $27,500 in overdraft fees on his Yorktown Checking Account.  In 2012, he accrued at least $18,025 of

[*15] overdraft fees on his Yorktown Payroll Account and at least $1,050 on his Yorktown Checking Account. In 2013 his total overdraft fees amounted to $20,503.

VIII. 2011 Joint Tax Return

Mr. and Ms. Clark filed a joint return for 2011 in October 2012. They hired Dorothy Jackson to prepare their return. Ms. Jackson was neither a certified public accountant (C.P.A.) nor a public accountant, and she lacked any training or education in finances, tax forms, and tax filings.

The Clarks provided Ms. Jackson with bank statements from only the Yorktown Checking Account to prepare their tax return. They did not provide Ms. Jackson with information concerning the Yorktown Payroll Account or the Locust Grove Checking Account. Nor did the Clarks provide Ms. Jackson any information regarding checks payable to Clark's Body Shop that were deposited directly into the loan accounts.

The Clarks filed one Schedule C with their return. The Schedule C reported gross receipts of $562,317, cost of goods sold (COGS) of $329,014, gross profit of $233,303, other income of $750, and gross income of $234,053. Mr. Clark reported total Schedule C expenses of $205,254 and a net profit of $28,799. The Clarks also attached Schedule A, Itemized Deductions, to their return reporting

[*16] total deductions of $12,094, including a home mortgage interest deduction of $11,950.  The Clarks also attached Schedule E, Supplemental Income and Loss, which did not list their rental properties and reported no income or expenses.

The Clarks reported adjusted gross income (AGI) of $30,708, itemized deductions of $12,094, and personal exemptions, all of which netted to taxable income of $114.  They reported tax due of $11, which they offset by a child tax credit of $11.  After claiming an earned income tax credit and an additional child tax credit, the couple claimed a refund of $3,317.

IX.    Examination of the 2011 Return

In August 2013, the Commissioner began examining the Clarks' 2011 return, initially focusing on the reported Schedule C repairs and maintenance and COGS.  The revenue agent assigned to the examination sent the Clarks a letter notifying them of the examination and asking them to call her by September 10, 2013, to set up an appointment.  When the Clarks did not call by that date, the revenue agent sent a followup letter scheduling a face-to-face conference at the agent's office.

A.    Initial Interview and Information Document Request No. 1

The revenue agent sent the Clarks information document request (IDR) No. 1 with the followup letter.  IDR No. 1 requested that the Clarks bring documents to

[*17] the conference substantiating the information reported on their 2011 return. These documents included all relevant bank statements and deposit slips, printouts from computer programs showing income and expenses, copies of documents given to the tax return preparer, and documents verifying the Schedule C COGS.

On September 25, 2013, the Clarks met the revenue agent at her office for the initial examination interview. Ms. Clark recalled that Mr. Clark seemed nervous before the interview and brought fewer documents and receipts than she believed existed.

During the initial interview, the revenue agent asked the Clarks several questions regarding their assets and expenditures.[5] The Clarks stated that their only household income came from the body shop and that they fully reported income on their return. They did not mention any rental income.

The revenue agent asked the Clarks whether they owned any real property. The Clarks responded that they owned only their home and the body shop and that their home mortgage payments were $271 a month. When the revenue agent asked whether they could schedule a followup appointment at their home or business, the

---

[5]The revenue agent kept an activity record related to the examination and took notes during and after her initial interview with the Clarks.

[*18] Clarks replied that they did not have room to host the agent at their properties, which, as we previously recounted, included a 3,584-square-foot home.

The revenue agent inquired about the Clarks' personal property and how many vehicles they owned or leased. The Clarks responded that they had three vehicles: two 2006 Ford pickups and a 1991 Chevy Blazer. When asked whether they made any payments on these vehicles, the Clarks responded that they did not.

When asked how many bank accounts they maintained for the business, the Clarks answered that they had only one account. They were referring to the Yorktown Checking Account. The Clarks provided the revenue agent with an Excel spreadsheet listing deposits into the account and claimed that the spreadsheet showed all Schedule C receipts. The deposits listed on the spreadsheet matched the gross receipts the Clarks reported on their 2011 return. The Clarks did not disclose the existence of the Yorktown Payroll Account or the Locust Grove Checking Account. But when the Clarks provided their Yorktown Checking Account records, they inadvertently provided the revenue agent with records of both that account (the only account they admitted existed) and the Yorktown Payroll Account (which they did not admit existed). The revenue agent believed, and we find, that the Clarks intended to provide statements from only the Yorktown Checking Account and that they disclosed the Yorktown Payroll

[*19] Account by accident. When the agent later noticed that the statement listed two accounts, she contacted Mr. Clark, who falsely informed her that the Yorktown Payroll Account contained only transferred funds.

The Clarks did not provide any other documents or receipts showing their income.

When the revenue agent continued the examination after the interview, she discovered several inconsistencies with the information the Clarks provided. When the agent reviewed the Clarks' Yorktown accounts, she discovered that the Yorktown Payroll Account contained deposits and not transfers, contrary to what Mr. Clark claimed. She also investigated the value of the Clarks' real estate holdings. Through the Mayes County assessor records she discovered the value of the Clarks' home was $459,656 during 2011-13 and the area was 3,584 square feet. The assessor records also showed the shops and sheds Mr. Clark built on the residential property. The revenue agent surmised that the Clarks' home was indeed large enough to host a followup appointment for the examination, contrary to the Clarks' previous assertions.

B.    IDR No. 2

In November 2013, the revenue agent sent the Clarks a second IDR. IDR No. 2 requested bank records and information on any bank accounts owned by the

[*20] Clarks other than the Yorktown Checking Account. She also asked for copies of job estimates to verify the COGS and Schedule C gross receipts the Clarks reported on their return. The Clarks responded to IDR No. 2 by providing the agent with job estimates, but they did not provide the requested bank records.

C.     IDR No. 3

In January 2014, the revenue agent sent a third IDR to Mr. and Ms. Clark separately. The agent also sent a bank deposit analysis for both the Yorktown Checking Account and Yorktown Payroll Account. The IDR asked the Clarks to review the bank deposit analysis and inform the agent if any of the deposits were from nontaxable sources.

IDR No. 3 also requested information regarding two additional account numbers that appeared in the Clarks' bank statements as "FREE BUSINESS CKG" accounts. The agent discovered the existence of these accounts after reviewing information provided by the Clarks. IDR No. 3 warned that if the Clarks did not provide information on the Free Business Checking accounts, she would issue summonses to the bank.

The Clarks did not provide the requested information, and the agent sent summonses to the bank in March 2014.

[*21] X.     2012 Joint Tax Return

Mr. and Ms. Clark filed a joint return for 2012 in October 2013, after the 2011 examination had begun and shortly after their first meeting with the revenue agent. Ms. Jackson did not prepare their 2012 return.

On their 2012 Schedule C, the Clarks reported gross receipts of $488,756, COGS of $336,545, gross profits of $152,211, other income of $1,520, and gross income of $153,731. The attached Schedule A reported home mortgage interest of $15,622. The Clarks submitted Schedule E, which did not list any of their rental properties, and reported $0 royalties received and $0 in expenses.

On the 2012 return, the Clarks reported AGI of $21,790, total itemized deductions of $18,396, and personal exemptions. They reported taxable income of zero. After claiming an earned income tax credit and an additional child tax credit, the Clarks claimed a refund of $4,498.

XI.     Continuation of 2011 Examination and Opening of 2012 Examination

A.     IDR No. 4 and 2012 Examination Letter

The revenue agent expanded the examination to include the Clarks' 2012 return in March 2014. She sent a letter notifying the Clarks of the expanding audit. She attached IDR No. 4, requesting copies of bank statements, deposit slips, and deposited checks spanning the period December 2011 to January 2013 for the

[*22] Yorktown Checking Account, the Yorktown Payroll Account, and the recently discovered Free Business Checking accounts. IDR No. 4 also requested a copy of the Clarks' 2012 return, along with a depreciation schedule. Predicated on information the agent had discovered, IDR No. 4 also asked "What is Clarks Upholstery? Why isn't a Schedule C filed for it?"

The revenue agent began noticing "indicators of fraud" such as understatement of income and concealment of bank statements while conducting the examination. In April 2014, the agent contacted a fraud coordinator at the Internal Revenue Service regarding the Clarks' examination.

Later that month, the revenue agent spoke with Mr. Clark on the phone. During the conversation, Mr. Clark informed the agent that he paid $300-$350 a month for his home mortgage. He also admitted the existence of the Wood Street and Graham Avenue properties and that he used them as rentals. These admissions contradicted his statements from the initial interview. He also admitted using his business accounts to pay personal expenses.

B.    IDR No. 5

On June 2, 2014, the revenue agent sent a fifth IDR to Mr. Clark, with copies to Ms. Clark and Vicki Ogden, Mr. Clark's representative. The IDR asked for responses by June 16, 2014.

**[\*23]** IDR No. 5 requested a copy of the sale contract for the 428th Street property and rental contracts for the Wood Street and Graham Avenue properties. The revenue agent never received this information. IDR No. 5 also requested information on how the Clarks pay only $300-$350 a month on a home worth over $400,000; the Clarks did not respond to this request. The Clarks were also asked to provide a spreadsheet showing how they calculated gross receipts so the revenue agent could discern which accounts the Clarks used to calculate their gross receipts. The revenue agent never received this information. IDR No. 5 also asked the Clarks to disclose how many and what kinds of cars or trucks they owned. The Clarks did not respond.

After receiving no response from the Clarks to IDR No. 5, the agent met again with the fraud coordinator on June 17, 2014.

C.     Summonses for the 2011 and 2012 Examinations

On June 19, 2014, the revenue agent issued summonses to Yorktown Bank and Bank of Locust Grove. The summonses requested bank statements, deposit slips, deposit items, and canceled checks for Mr. Clark and Clark's Body Shop for 2011 and 2012. The summonses also sought loan records for any loan accounts active in 2011 and 2012. The agent sent copies of the summonses to Mr. and Ms. Clark.

**[*24]** The summonses uncovered additional bank accounts and Mr. Clark's numerous loan accounts, of which the agent was previously unaware. The summonses also revealed that Mr. Clark directly deposited checks payable to Clark's Body Shop into the loan accounts to pay down his then-outstanding vehicle loans.

D.    Bank Deposit Analysis

Using the bank and loan statements she received from the summonses, the revenue agent constructed a bank deposit analysis for 2011 and 2012. The bank deposit analysis calculated the deposits into Mr. and Ms. Clark's bank and loan accounts during those years.

To construct the bank deposit analysis, the revenue agent referenced images of checks deposited into each account and determined the sources of the checks. She then added the total amount deposited into each account in 2011 and 2012. The agent calculated $983,584 of total deposits into the Clarks' accounts for 2011. The Clarks reported gross receipts of $562,317 in 2011. This amounted to a difference between reported receipts and total deposits of $421,267. For 2012, the agent calculated total gross receipts of $836,131. The Clarks had reported $488,756 of gross receipts for that year, making the difference between reported receipts and total deposits $347,375.

[*25] XII.    Mr. Clark's 2013 and 2014 Returns

Mr. Clark hired a C.P.A. to prepare his 2013 and 2014 tax returns. Ms. Ogden, who worked for the C.P.A. office at the time, created the general ledger used to prepare Mr. Clark's returns. She also served as a representative for the examination of the 2011 through 2014 returns. To prepare the general ledger, Ms. Ogden used bank records provided by Mr. Clark. Mr. Clark gave her several bank records to work from but omitted records for the Locust Grove Checking Account, and he did not inform Ms. Ogden of that account. Neither did he provide any loan records or inform Ms. Ogden that he directly applied income from the body shop to the loan accounts.

A.    Mr. Clark's 2013 Return

Mr. and Ms. Clark filed separate returns for 2013. On his 2013 Schedule C, Mr. Clark reported gross receipts of $650,632, COGS of $466,797, and gross income of $183,835. Reported expenses brought the net profit down to $13,126. He did not attach Schedule E reporting income from rental properties. On the return, Mr. Clark reported AGI of $5,586, itemized deductions of $13,617, and taxable income of zero. His itemized deductions included a home mortgage interest deduction of $11,454. He did not claim an earned income tax credit as he had for previous years, but he claimed an additional child tax credit.

**[\*26]** B.　　Mr. Clark's 2014 Return

Mr. and Ms. Clark also filed separate returns for 2014.  Mr. Clark's Schedule C showed gross receipts of $657,051, COGS of $513,120, and gross income of $143,931.  He reported $138,971 of total Schedule C expenses and a net profit of $4,960.  On his Schedule A, Mr. Clark reported a home mortgage interest deduction of $11,275.  Again, he did not attach Schedule E reporting rental income.  Mr. Clark reported no AGI, itemized deductions of $16,346, and no taxable income.

XIII.　Examination of the 2013 and 2014 Returns

The Commissioner opened an examination into Mr. Clark's 2013 and 2014 returns and assigned the same revenue agent to the examination.

A.　　Examination Letter and IDR No. 1 for 2013

In February 2016, the revenue agent sent Mr. Clark, and Ms. Ogden as Mr. Clark's representative, a letter informing Mr. Clark that the Commissioner had expanded his examination to cover Schedule C gross receipts reported on Mr. Clark's 2013 return.

The agent attached an IDR to the letter.  IDR No. 1 for 2013 requested all bank and brokerage statements for 2013, copies of all loans and proof of payment

[*27] during 2013, and all relevant schedules and workpapers. The agent requested these documents by March 11, 2016, but received no response.

B.    IDR No. 2 for 2013

The agent sent Mr. Clark and Ms. Ogden a second IDR on March 28, 2016. IDR No. 2 for 2013 requested the same information as IDR No. 1 but informed Mr. Clark that if he did not respond by April 11, 2016, the agent would issue summonses to obtain the information. Ms. Ogden responded, sending the agent the bank statements she had. The agent began a bank deposit analysis for 2013 using these documents.

C.    IDR No. 3 for 2013

On May 6, 2016, the revenue agent sent a third IDR to Mr. Clark and Ms. Ogden. IDR No. 3 for 2013 requested bank statements from the Locust Grove Checking Account for 2013 and warned that if Mr. Clark did not provide the statements the agent would issue a summons. It also requested copies of checks used to pay Mr. Clark's various vehicle loans, again noting that the agent would issue summonses if the documents were not provided. IDR No. 3 for 2013 also asked for receipts or invoices for specified transactions to substantiate COGS and certain purchases. The IDR gave Mr. Clark a deadline of May 20, 2016, to respond.

[*28] Mr. Clark sent the agent receipts to substantiate the COGS and other purchases and provided bank statements for the Locust Grove Checking Account. However, he did not send copies of checks used to repay the loans.

D.    2013 Summonses

On June 26, 2016, the revenue agent sent summonses to Bank of Locust Grove, Yorktown Bank, and Lakeside Bank of Salina seeking loan repayment records for 2013.  Mr. Clark received copies of the summonses.

The summonses unearthed loan accounts that had not previously been uncovered.  These new accounts included the account relating to the $30,000 line of credit used for the body shop at Yorktown Bank, loans for the 1999 Lincoln, the 1995 Ford F150, the 1972 Chevy 1/2 Ton, the 1947 Rat Rod, and the Grasshopper Mower.  Mr. Clark had not previously disclosed the existence of these vehicles or their corresponding loans to the revenue agent.  Through the summonses, the revenue agent again found that Mr. Clark deposited gross receipts from Clark's Body Shop directly into the loan accounts to pay off those loans.

E.    IDR No. 4 and IDR No. 5 for 2014

On July 29, 2016, the revenue agent sent a fourth IDR to Mr. Clark.  IDR No. 4 for 2014 requested all bank statements and loan documentation for 2014 and copies of profit and loss information, any balance sheets, and the general ledger

[*29] used to prepare Mr. Clark's 2014 return. Mr. Clark did not respond to these requests by the August 12, 2016, due date.

The revenue agent sent another IDR on August 19, 2016, to Mr. Clark and Ms. Ogden. IDR No. 5 for 2014 requested the same information as IDR No. 4 for 2014 with a due date of September 2, 2016. The agent received no response.

### F.    2014 Summonses

When Mr. Clark did not respond to IDR No. 5 for 2014, the revenue agent sent summonses to Bank of Locust Grove, Yorktown Bank, and Lakeside Bank. She received bank statements, deposit slips, deposited items, and loan documentation. With this information the revenue agent prepared a bank deposit analysis.

### G.    Bank Deposit Analysis for 2013 and 2014

The revenue agent prepared a bank deposit analysis for 2013 and 2014 using the same method she employed for 2011 and 2012. The analysis contained information from the Yorktown Checking Account, Yorktown Payroll Account, and the Locust Grove Checking Account, plus the loan accounts. It determined that Mr. Clark had taxable deposits of $843,337 for 2013 and $750,054 for 2014. These figures surpassed Mr. Clark's reported gross income by $192,705 for 2013 and $93,003 for 2014. From the analysis, the revenue agent concluded that Mr.

[*30] Clark did not provide Ms. Ogden with his complete financial information before she completed the general ledger for his 2013 and 2014 returns. And he did not inform her that he deposited checks directly into loan accounts to pay his vehicle loans.

## XIV. Civil Fraud Penalty

The revenue agent ascertained that Mr. Clark was liable for civil fraud penalties. The agent concluded that the Clarks "intended to evade their tax liability by understating income on their 2011 and 2012 tax returns," making them liable for civil fraud penalties. The agent noted that the indicators of fraud included concealment of bank accounts, concealment of property, and a substantial excess of personal expenditures over available resources. On March 25, 2016, the agent's group manager signed a penalty approval form approving section 6663 penalties for 2011 and 2012.[6]

For 2013 and 2014, the agent also concluded that Mr. Clark "intended to evade his tax liability by understating income on his 2013 and 2014 tax returns" and was thus liable for civil fraud penalties. The indicators of fraud were

---

[6]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*31] concealment of bank accounts and substantial excess of personal expenditures over available resources. On December 28, 2016, the agent's group manager signed a penalty approval form approving section 6663 civil fraud penalties for 2013 and 2014.

XV. Notices of Deficiency

The Commissioner mailed Mr. and Ms. Clark a notice of deficiency for 2011 and 2012 on July 25, 2016. The notice determined a $101,648 deficiency for 2011 and a $108,823 deficiency for 2012. It determined that the Clarks had underreported Schedule C gross receipts by $421,267 for 2011 and $347,375 for 2012. But it allowed additional expense deductions under Schedule C for other expenses of $42,054 and COGS of $66,725 for 2011. The notice also disallowed $532 of the Schedule C repairs and maintenance expenses deduction reported on the 2011 return. And the Commissioner determined section 6663 civil fraud penalties of $73,748 for 2011 and $78,244 for 2012.

The Commissioner mailed a notice of deficiency for 2013 and 2014 to Mr. Clark on March 29, 2017. The notice determined an $88,135 deficiency for 2013 and a $28,390 deficiency for 2014. The deficiencies again largely resulted from the Commissioner's determination of unreported Schedule C gross receipts of $192,705 for 2013 and $93,003 for 2014. The Commissioner also determined that

[*32] Mr. Clark overreported his Schedule C other expenses by $49,574 for 2013 and $9,970 for 2014. The notice also decreased the 2013 reported COGS other costs by $3,042 and purchases by $2,881 because of a lack of substantiation. The Commissioner determined section 6663 civil fraud penalties of $66,101 for 2013 and $21,293 for 2014.

In compiling both notices of deficiency, the Commissioner used the revenue agent's bank deposit analyses to adjust Clark's Body Shop's Schedule C gross receipts.

XVI. Court Filings and Trial

Mr. Clark timely filed two petitions with this Court while residing in Pryor, Oklahoma. We consolidated the cases, at docket Nos. 23074-16 and 13576-17, for trial, briefing, and opinion. Mr. Clark argued that the Commissioner erred by "arbitrarily" determining his deficiencies and by relying on the revenue agent's bank deposit analyses in making calculations. He further argues that his alleged underpayments were not due to fraud.

At trial, the Commissioner made several concessions. He acknowledged that certain items of income included in the bank deposit analyses were nontaxable, recognized that Mr. Clark's rental income was not includible as Schedule C gross receipts, and acknowledged that some deposits included in the bank deposit

[*33] analyses were reported on Mr. Clark's Schedules E. The parties entered into a second supplemental stipulation of facts to memorialize these concessions.

OPINION

We are asked to decide: (1) the extent to which Mr. Clark underreported his income and (2) whether he is liable for the civil fraud penalties under section 6663. We will start with Mr. Clark's deficiencies.

I. Unreported Schedule C Income

A. Burden of Proof

In general, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise.[7] In limited situations, the burden may shift to the Commissioner under section 7491(a). Mr. Clark does not argue that the Commissioner should bear the burden, and we find the facts do not warrant such a shift. Accordingly, Mr. Clark bears the burden of proof. In cases involving unreported income, the Commissioner must come forward with evidence to connect the taxpayer with an income-producing activity.[8] The evidence clearly establishes Mr. Clark's connection with a variety of income-producing activities.

[7]Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[8]See Harrington v. Commissioner, T.C. Memo. 2021-95.

**[\*34]** B.  <u>Bank Deposit Analyses</u>

Gross income includes "all income from whatever source derived."[9] Taxpayers must maintain and keep records substantiating their income and expenses.[10] If a taxpayer fails to do so, the Commissioner may determine the taxpayer's income through any method that clearly reflects income.[11] The Commissioner's reconstruction of income "need only be reasonable in light of all surrounding facts and circumstances."[12]

A bank deposit analysis is a recognized method of computing unreported income.[13] If a taxpayer has not maintained records but has significant bank deposits, the Commissioner is neither arbitrary nor capricious in using a bank deposit analysis to compute income.[14] Bank deposits are prima facie evidence of income, and the Commissioner is not required to show a likely source of the

---

[9]Sec. 61(a).

[10]Sec. 6001.

[11]Sec. 446(b); <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 693 (1989).

[12]<u>Petzoldt v. Commissioner</u>, 92 T.C. at 687.

[13]<u>Clayton v. Commissioner</u>, 102 T.C. 632, 645 (1994).

[14]<u>Clayton v. Commissioner</u>, 102 T.C. at 645.

**[\*35]** income.[15]  We presume that the bank deposit analysis is correct, but the Commissioner "must take into account any nontaxable source or deductible expense."[16]  The taxpayer bears the burden of proving that a deposit is nontaxable or that the analysis is unfair or inaccurate.[17]

The Commissioner's bank deposit analyses were reasonable.  The revenue agent cross-referenced images of deposited checks with amounts deposited in Mr. Clark's accounts to prepare the analyses.  She obtained most of the bank information through summonses after Mr. Clark repeatedly failed to provide her with the requested information.  This is a sound and reasonable method of reconstructing Mr. Clark's income, and Mr. Clark did not show that the analyses were unfair or unreasonable.  He successfully pinpointed nontaxable and duplicative deposits within the analyses, and the Commissioner conceded that these deposits should be excluded from Mr. Clark's taxable income.

But even after taking into consideration the nontaxable deposits, the bank deposit analyses show that Mr. Clark still had significant unreported income.  Mr. Clark is thus liable for tax attributed to unreported income for Schedule C and

---

[15]Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

[16]Clayton v. Commissioner, 102 T.C. at 645-646.

[17]Clayton v. Commissioner, 102 T.C. at 645.

**[\*36]** Schedule E (for the amounts reclassified as rental income) for each year at issue.

## II.    Section 6663 Civil Fraud Penalties

Section 6663 imposes a penalty of 75% of an underpayment of tax if any part of the underpayment is attributable to fraud.[18]  If the Commissioner alleges fraud, he bears the burden of showing by clear and convincing evidence that the taxpayer fraudulently underpaid his tax.[19]  The Commissioner must show for each relevant year that (1) the taxpayer underpaid his tax and (2) that underpayment was attributable to fraud.[20]  Fraud occurs when the taxpayer intended to evade taxes through conduct intended to conceal, mislead, or prevent the collection of taxes.[21]

The existence of fraud is a question of fact to be resolved by considering the entire record.[22]  It may be proven by circumstantial evidence and reasonable

---

[18]Sec. 6663(a).

[19]Sec. 7454(a); Rule 142(b); Recklitis v. Commissioner, 91 T.C. 874, 909 (1988).

[20]Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

[21]Petzoldt v. Commissioner, 92 T.C. at 699.

[22]Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

[*37] inferences drawn from the facts because direct proof of intent is rarely available.[23]  And the taxpayer's entire course of conduct may be considered.[24]

In considering fraudulent intent, courts have long looked to recognized "badges of fraud."[25]  These badges of fraud include:  (1) understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) filing false Forms W-4, Employer's Withholding Certificate; (8) failure to make estimated tax payments; (9) dealing in cash; (10) engaging in illegal activity; and (11) attempting to conceal illegal activity.[26]  We consider these badges of fraud in the light of a taxpayer's education and sophistication.[27]  However, misleading statements during an audit, even from an unsophisticated taxpayer, may indicate fraudulent intent.[28]

---

[23]Rowlee v. Commissioner, 80 T.C. at 1123.

[24]Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).

[25]See, e.g., Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Ankerberg v. Commissioner, T.C. Memo. 2018-1, at *7.

[26]Niedringhaus v. Commissioner, 99 T.C. at 211.

[27]Niedringhaus v. Commissioner, 99 T.C. at 211; Wickersham v. Commissioner, T.C. Memo. 1999-276, 78 T.C.M. (CCH) 315, 319 (1999).

[28]Ankerberg v. Commissioner, at *7.

[*38] Many badges of fraud are evident in these cases. First, Mr. Clark significantly underreported his income. The Commissioner's bank deposit analyses establish that Mr. Clark generated significantly more gross receipts than he reported on his 2011 through 2014 returns.

Mr. Clark's underreporting was so significant that his reported income was a small fraction of his loan repayments. Mr. Clark reported AGI of $30,708 for 2011, $21,790 for 2012, $5,586 for 2013, and $0 for 2014. Without taking into account Mr. Clark's reported home mortgage interest deductions of at least $11,000 each year, he reported a combined total AGI of $58,084 for 2011 through 2014. But during these four years he paid approximately $173,250 to repay 15 vehicle loans and approximately $180,600 to repay real property loans for his rental properties and business. It is clear that Mr. Clark could not have made these considerable loan repayments with the income he reported. The Commissioner has thus shown that Mr. Clark substantially underreported his income for 2011 through 2014.

Mr. Clark's counsel argued that Mr. Clark lacked the sophistication and acumen to purposefully underreport his income. Counsel points to Mr. Clark's substantial overdraft fees at his banks, his learning disability, his struggle with

**[*39]** higher math concepts, and his belief that if he immediately spent money that came in, "it would wash out" and not count as income for Federal tax purposes.

While it may be true that Mr. Clark is neither highly educated nor well-versed in the tax code, he had enough financial sense to run his own business for decades, manage multiple rental properties, and timely repay over a dozen auto loans in four years. He had three years of college as a pre-med major and admitted that he would have had a better understanding of his tax filings if he had put in the effort. Contrary to counsel's argument, Mr. Clark did not underreport his income because he did not understand how to comply with the tax laws. He knowingly underreported to avoid paying tax on his full income, even if he did not completely appreciate the consequences of doing so. Mr. Clark's actions and behavior show that he knew he was evading his tax responsibilities, and he attempted to continue this evasion once the examination began.

Mr. Clark actively attempted to deceive the revenue agent, indicating that he fully grasped the situation and the purpose of the audit. He misled the agent during the initial interview, telling her that his only household income came from the body shop. The agent later discovered that he also had income from his rental properties. When asked how many business bank accounts he had, Mr. Clark responded that he had one. He had five. Mr. Clark admitted owning two pieces of

**[*40]** real property, his home and the body shop, neglecting to mention his three rental properties. He also claimed that he and Ms. Clark owned three vehicles when they owned several more. Mr. Clark even contradicted some of these statements in followup conversations with the revenue agent.

Mr. Clark also sought to conceal his income by failing to provide records to the revenue agent. He brought few receipts and documents to the initial interview. After the interview, the revenue agent sent Mr. Clark several IDRs requesting additional information. Mr. Clark largely ignored these requests. When he did respond, he provided incomplete information. The revenue agent had to resort to summonses to reveal the extent of Mr. Clark's finances.

Despite these obfuscations, Mr. Clark was fully aware of his assets. He compiled financial statements to extend a line of credit in which he claimed $1.29 million of assets and a net worth of $923,000. As part of his divorce proceedings, Mr. Clark had to reckon with his assets and liabilities to divide the couple's assets. He was fully aware of his assets and expenditures. Mr. Clark made false statements to the revenue agent in an effort to derail the examinations and mislead the revenue agent.

**[*41]** III.    <u>Penalty Approval</u>

To impose penalties, the Commissioner must present evidence showing that the initial determination to do so was timely approved in writing by the revenue agent's immediate supervisor.[29] The "initial determination" of a penalty occurs the earlier of when the Commissioner issues a notice of deficiency[30] or when the Commissioner formally communicates to the taxpayer his penalty determination.[31]

The supervisor of the revenue agent approved imposing section 6663 penalties on Mr. Clark for his 2011 and 2012 tax years on March 25, 2016. The Commissioner mailed Mr. Clark his notice of deficiency for those years on July 25, 2016. The supervisor approved section 6663 penalties for Mr. Clark's 2013 and 2014 tax years on December 28, 2016, and the Commissioner sent the notice of deficiency on March 29, 2017. Accordingly, the Commissioner has met his procedural obligations and burden of production for these penalties.

Mr. Clark knowingly attempted to evade his tax obligations. He misled the revenue agent, provided inadequate records, and failed to cooperate with the

---

[29]Sec. 6751(b)(1).

[30]<u>Clay v. Commissioner</u>, 152 T.C. 223, 248 (2019), <u>aff'd</u>, 990 F.3d 1296 (11th Cir. 2021).

[31]<u>Belair Woods, LLC v. Commissioner</u>, 154 T.C. 1, 14-15 (2020).

**[\*42]** examination. Because Mr. Clark underpaid his tax and those underpayments were attributable to fraud, he is liable for a section 6663 penalty for each year before us.

To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.